[No. 11947.   Department Two.   July 30, 1914.]

MARY A. HOBBS, *as Administratrix etc., Respondent,* v. GREAT NORTHERN RAILWAY COMPANY, *Appellant.*[1]

MASTER AND SERVANT — INJURY TO SERVANT — SCOPE OF EMPLOYMENT—EVIDENCE—SUFFICIENCY. A verdict cannot be sustained for wrongful death of a minor employed as a hostler's helper, who was killed while on the pilot of an engine during a collision, where the testimony of plaintiff's witnesses as to the reason for his presence there was purely speculative, and it was clearly established that he was not in the performance of his duties, and was violating a rule forbidding employees to ride on engine pilots.

EVIDENCE—HEARSAY—RES GESTAE. Evidence of statements made by an employee after an injury resulting in his death is not admissible as part of the *res gestae*, where they in no way explained or characterized the main fact, but were concerning what happened just prior to the accident, being merely the narration of a past event.

MASTER AND SERVANT—FEDERAL EMPLOYER'S LIABILITY ACT—SCOPE OF EMPLOYMENT. A recovery cannot be had under the Federal Employer's Liability Act for the wrongful death of an employee while on the pilot of an engine, by merely showing the injury and that the employee was at the time engaged in interstate commerce, nor in the absence of negligence occasioning the injury; and the duty to furnish the servant a safe place in which to work not extending to places where he is not required or expected to be in performing his duties, it is incumbent upon the plaintiff to show that the servant was, at the time of the injury, engaged in some act incidental to his employment.

[1]Reported in 142 Pac. 20.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered October 14, 1913, upon the verdict of a jury rendered in favor of the plaintiff, in an action for wrongful death. Reversed.

*F. V. Brown* and *F. G. Dorety,* for appellant.

*Arthur E. Griffin,* for respondent.

MORRIS, J.—Respondent brought her action under the Federal employers' liability act, to recover for the death of her minor son who was a hostler's helper in appellant's employ in its Interbay yards, Seattle. The accident, resulting in the death of the minor, Charles Hargraves, happened about seven a. m., November 16, 1912. The deceased was a member of the night crew, and had been assisting in preparing the engines to go out upon the road, by providing them with fuel oil, sand, and water. His work was ended at seven o'clock, when the day crew came on duty. The last work he was engaged in concerning which there was no dispute was putting sand in an engine which then stood at the sand house. There is some dispute as to whether the sand was being placed in the dome of the engine or behind the firebox door, but this is immaterial, as it is apparent that, whether the sand was being placed in the dome or in the rear of the cab, it would not call for deceased's presence at the place where he was when he received his injury. At this time, engine 960 was standing on the round house track, and a switch engine was standing on a store house track, connecting with the round house track, so close to the frog that it was not in the clear. Engine 960 was being prepared for passenger service, and at the proper time was supposed to back down to the depot, when the switch engine was to take its place and obtain its supply of sand and water. For some reason, upon which the evidence is in conflict, engine 960 moved forward a short distance until its pilot collided with the foot board at the rear of the switching engine.

At the time of the collision, Hargraves was standing on the pilot of engine 960, and received injuries resulting in his death. It seems to be admitted that, because of the amount of steam from the engines, Hargraves' position upon the pilot of 960 could not be seen by the crew of either engine, and there is no contention that the engineer or the fireman of either engine knew he was on the pilot. As above stated, the last work of the deceased, prior to his getting upon the pilot, was assisting in filling up the sand box. The only positive testimony is that, after completing this work, Hargraves pulled a plank which connected the sand house platform with the running board of the engine upon which they were at work, back to the platform, and was standing on the platform, while another hostler's helper who had been assisting him went to the water tank near by to perform other duties. The next appearance of Hargraves was on the ground near to the pilot of engine 960. How he got there or what he was doing there no one seems to know. He was then seen to step upon the pilot of engine 960 as it moved forward, facing the rear and then turning around towards the round house. No one knows why he stepped upon the pilot, nor do any of those who saw him testify that he was doing anything when the engine moved forward. Some of those standing near saw the probability of a collision with the switch engine and shouted a warning, to which he paid no attention, either not hearing or not heeding it.

So far as we can discover from this record, Hargraves had no duties to perform which would take him upon the pilot of the engine at this time, and the reason for his presence there is a matter of conjecture. It is shown that there was a rule posted in the round house forbidding employees to ride on engine pilots, and that, in addition to this rule, Hargraves, who had been in the employ of the company for only about a month, had on two occasions been told by the hostler not to ride on the pilot. If the deceased was at work at the time he received his injury, in the performance of some required duty,

this verdict must be sustained. With that view we have carefully examined the record to ascertain, if possible, what the deceased was doing upon the pilot, or what he purposed to do when he went there; and we can find nothing which refutes the positive testimony that he had no duties to perform which would take him there, or of those eyewitnesses to his position on the pilot that he was not performing any at the time.

One of the witnesses for the plaintiff gives it as his opinion, or as he puts it "my idea," that, after the plank used in filling the sand box was taken down, Hargraves walked along the running board to the front of the engine and then stepped down to the pilot, supporting his theory by saying he did not have the time to get down to the ground and walk around to the front end of the engine. But this is only speculation, and is refuted by the testimony of a number of witnesses who saw him step from the ground to the pilot as the engine moved forward. Another theory offered by respondent is that deceased was on the pilot for the purpose of oiling a relief valve. Neither of these theories is supported by any testimony. They are nothing more than conjectures as to what he might have been doing. On the other hand, the testimony of all those who saw Hargraves just before he received his injury is, not only that he was standing on the ground when engine 960 started to move, and that he stepped upon the pilot from the ground, but that he had no oil can or other appliance in his hand. This is supported by testimony that it was no part of his duty, or of the hostler's crew, to oil the relief valve, and that he had no access to the lubricating oil.

If there was any conflicting testimony upon this point, the jury might have disregarded this testimony as we have referred to it, and found otherwise. But respondent offers no conflicting testimony; she contents herself with testimony that is purely speculative, and points out only what he might have been doing. We do not think the jury, without supporting testimony, should be permitted to speculate as to what Hargraves might have been doing, when the testimony of all

the eyewitnesses points clearly to what he was doing; nor that they should theorize as to how he reached his position on the pilot when there is no conflict on that point. *Long v. McCabe & Hamilton*, 52 Wash. 422, 100 Pac. 1016; *Scarpelli v. Washington Water Power Co.*, 63 Wash. 18, 114 Pac. 870.

Appellant also offers testimony to the effect that it would be impossible to oil a relief valve of the type on engine 960 from the place where the deceased stood or with the engine standing still. The deceased was five feet eight inches tall. The relief valve upon the engine was eight feet from where he stood. Appellant's testimony is all to the effect that the relief valve could not be reached by Hargraves from the position in which he stood. This is not only the evidence of appellant; but a locomotive engineer, introduced by respondent for the purpose of giving expert testimony, admits that the relief valve on this engine could not be reached by a person standing in the position of Hargraves. The only testimony we can find as to oiling relief valves from the pilot is that of one witness who says it could be done by standing on the pilot beam and leaning over and holding onto a brace. But the evidence shows that Hargraves was standing on the foot board and not on the pilot beam. Had he been on the pilot beam, he would not have been injured, as the impact of the collision was very slight, resulting in no appreciable damage to either engine. Another witness testified that this type of valve could be oiled with the engine standing still, by taking a wrench and turning the valve up, putting a stick under the cap of the steam chest, pushing the plunger down, and pouring in oil. This testimony is all speculative so far as it furnishes any guide to what Hargraves was doing, and is in direct conflict with the testimony of all those who were present at the time and testified to what he was actually doing at the time. It might have been done in the manner described by this witness, but there is no evidence that Hargraves was making any such attempt. He had neither oil can, wrench,

nor stick, and, in addition, had changed his position so that his back was toward the relief valve.

Counsel for respondent, in his argument, asks, "If he was not oiling the engine, why was he there?" As we view the law, it is incumbent upon respondent to show what Hargraves was doing, and that, at the time of his injury, he was in the performance of some duty owing to the appellant; and not for appellant to make some affirmative showing to relieve it from liability. From the record, the only possible answer to the question is that he was not oiling the relief valve, and his purpose in stepping upon the pilot is a pure guess.

After the injury to Hargraves, he was taken to the hospital, where his mother arrived about 10:30, shortly before his death. She was interrogated as to his condition while she was there, and the record of her testimony is in part as follows:

"Q. Was he fully conscious when you got there? A. No, he was only semi-conscious. At the same time, if I spoke to him I was able to kind of bring him to for a minute. He seemed to know me, but immediately he was gone again. He raved continually about his work principally. Q. Did he seem to be fully conscious? A. I believed he was when I spoke to him first. Q. What did he say to you when you got there, Mrs. Hobbs?"

Counsel for appellant here made an objection which, after some discussion on the part of respective counsel, was overruled, and the question was renewed:

"Q. Just state what your son said to you, Mrs. Hobbs, as to what he was doing at the time he was injured. A. He told me that he was applying oil to the relief valve. Q. What did he say in regard to its being the last work that he had to do? A. He said, 'Mamma, I was just finishing. I was applying oil to the relief valve and then I was through."

The admission of this testimony is now urged as error. If admissible at all, it can only be upon the theory that it was part of the *res gestae*, since dying declarations are admissible as such only in cases of felonious homicide. It is difficult to

define the doctrine of *res gestae* so as to fit every case in which it is sought to be applied. The distinguishing feature of statements or declarations admissible under this rule is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparation for or emanations of such act. Such incidents, whether acts or declarations, become in this way evidence of the character of the main act as illustrating or explaining that act. Jones, Evidence, § 334. In *Henry v. Seattle Elec. Co.*, 55 Wash. 444, 104 Pac. 776, we laid down this rule:

"In order to be a part of the *res gestae*, the subsequent declaration must explain or in some way characterize the main fact. It must not be the narration of a past event, nor the expression of an opinion."

What was the "main fact" or "things done" in this case? The only possible answer is the coming together of these two engines and the consequent injury to Hargraves. This was the litigated fact upon which it was sought to establish the cause of action. The declaration of Hargraves did not explain nor characterize this main fact. It offered no explanation of the reason why the engines came together. It in no way characterizes what happened when they did come together. It illustrated neither cause nor effect. It can only be characterized as a statement of what Hargraves was doing just prior to the declaration, in no way connected with it; and as such it was a narration of a past event. The mere fact that, if Hargraves had survived his injuries and sought recovery against appellant, it would have been competent for him to testify to what he was doing at the time, does not establish its admissibility as a part of the *res gestae*. The admissibility of evidence is not to be determined by such a test, for witnesses ofttimes testify to facts which those to whom they have related them may not testify to without violating the rule against hearsay evidence. For these reasons we are of the opinion that this evidence was improperly admitted, and

that it cannot be considered in determining the question submitted by this appeal.

One of the leading cases upon this point, cited as authoritative by the courts and textwriters, is *Waldele v. New York, C. & H. R. R. Co.*, 95 N. Y. 274, 47 Am. Rep. 41, where a deaf mute was fatally injured by one of defendant's trains. About thirty minutes after the accident, he made certain statements to his brother to which, over objection, the brother testified as follows: "John said he got hit. John said there was a long train; that he stood waiting for it to go and an engine followed and struck him." The admission was held error and the declaration no part of the *res gestae;* the court giving as its reason for the holding that the *res gestae* was the accident; that the declarations were not part of that, did not characterize it nor throw any light upon it, but were purely narrative, giving an account of a transaction wholly past, and depending for their truth wholly upon the accuracy and reliability of the deceased and the verity of the witness who testified to it. The court then enters upon a discussion of the rule, reviewing many cases supporting these declarations. If the declaration in that case was the narration of a past event and not admissible as part of the *res gestae,* how can we otherwise characterize the declaration in this case? There the declaration was as to what happened just prior to the accident but not explaining it; here the declaration is of the same nature. In that case, the deceased stated that he was waiting for a long train to pass and was struck by an engine following; here the declaration was that he was applying oil to the relief valve and then he was through. Each case narrates a past event which must be covered by the same rule. If there is any distinction between the two cases in respondent's favor, it is to be found in the cited case, because of the fact that the declaration there is stronger in favor of her contention in that it contained a statement that the deceased was struck by an engine following the long train, and to that extent might be said to state

the cause of the injury, were it not narrative in character. But the case before us is that much weaker in that it does not purport to explain the accident, nor illustrate it. Many authorities might be cited, but the following are sufficient to illustrate the rule here applicable: *Steinhofel v. Chicago, M. & St. P. R. Co.*, 92 Wis. 123, 65 N. W. 852; *Johnston v. Oregon S. L. & U. N. R. Co.*, 23 Ore. 94, 31 Pac. 283; *Tennis v. Interstate Consolidated Rapid-Transit R. Co.*, 45 Kan. 503, 25 Pac. 876; *Corder v. Talbott*, 14 W. Va. 277; *Wagner v. Clausen & Son Brewing Co.*, 146 App. Div. 70, 130 N. Y. Supp. 584; *Gebus v. Milwaukee, St. P. & S. S. M. R. Co.*, 22 N. D. 29, 132 N. W. 227; *Kehan v. Washington R. & Elec. Co.*, 28 App. D. C. 108; Jones, Evidence (2d ed.), § 345; note to *Walters v. Spokane Int. R. Co.*, 58 Wash. 293, 108 Pac. 593, 42 L. R. A. (N. S.) 918.

Respondent cites the following cases from this court as sustaining the admissibility of this declaration: *Roberts v. Port Blakely Mill Co.*, 30 Wash. 25, 70 Pac. 111; *Starr v. Aetna Life Ins. Co.*, 41 Wash. 199, 82 Pac. 113, 4 L. R. A. (N. S.) 636; *Walters v. Spokane Int. R. Co.*, 58 Wash. 293, 108 Pac. 593, 42 L. R. A. (N. S.) 917; *Riggs v. Northern Pac. R. Co.*, 60 Wash. 292, 111 Pac. 162. In each of these cases, the statement admitted in some way explained the accident and cause of the injury, and was, for this reason, held to be within the rule. This declaration makes no attempt to explain the accident causing the injury, and hence the same reasoning would not apply.

One of the questions in the case is whether the deceased was injured while acting within the scope of his employment. Respondent contends that, this action being under the Federal employers' liability act, the statute renders such question immaterial, and that the only test is, Was the employee injured while employed by a carrier engaged in interstate commerce? The Federal act does not give a cause of action to the employee for injuries not occasioned by negligence, and no recovery can be had under this act by simply showing the in-

jury and that at the time the injured servant was engaged in interstate commerce. The rule of liability against a railway company engaged in interstate commerce is predicated upon the duty of the company to furnish its servant with a reasonably safe place in which to perform the work it requires of him, or while he is about those places which are incident to his work, and this duty is incident to all places where the employee must necessarily be in connection with his employment. But that duty is not incident to places where a servant is not required to be, nor expected to be, in the performance of his work. Nor does it cover the servant when he is not within the scope of his employment or doing some act which is not incidental to his employment. This rule is sustained by all the authorities, and the Federal act in no wise attempts to change it. Unless the evidence in this case shows that the deceased was upon the pilot of this engine in the discharge of some duty required by the railway company, then the railway company owed him no duty except to avoid injuring him after it discovered his perilous position. Such is so clearly the law that it will not be doubted, and no authorities need be cited to sustain it. There is no evidence in this record that the deceased was required to do any act which would place him upon the pilot of the engine. All the evidence on this subject is to the contrary. So far as we can find, whatever it was that caused him to step upon the pilot, it was his own purpose not in any way connected with his work as a hostler's helper. If it was his purpose to engage in any task, so far as this record goes in so showing, he was a volunteer without appellant's direction or knowledge, and so far as the law is concerned, the result is the same. If we could find anything in the evidence which would justify a different conclusion, however meager it might be, we would submit to the verdict as determinative of the fact. But we cannot find it, and such being the case, however unfortunate or distressing the circumstances may be, it is our duty to so hold.

The lower court should have sustained appellant's challenge to the sufficiency of the evidence and given judgment in its favor. The judgment is reversed, and the cause remanded with instructions to enter judgment in favor of appellant.

CROW, C. J., MOUNT, and PARKER, JJ., concur.